UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

              Case No. 22-cr-162-pp

 v.

MICHAEL T. SHELTON, JR.,

    Defendant.

**ORDER OVERRULING OBJECTION (DKT. NO. 52), ADOPTING JUDGE DUFFIN'S REPORTS AND RECOMMENDATIONS (DKT. NOS. 42, 51) AND DENYING DEFENDANT'S FIRST AND SECOND MOTIONS TO SUPPRESS (DKT. NOS. 29, 30)**

On September 1, 2020, Parole Agent Heather Wood received a call from the defendant's neighbor who said the defendant was violating his rules of extended supervision. Dkt. No. 51 at 2. Among other things, the neighbor saw an extended clip in the defendant's right pocket and heard the defendant say, "that's why I keep protection on me." Id. Wood completed a Community Corrections Home Search Plan, shared it with her supervisor, Debra Rozier, and received approval to search the defendant's home. Id. at 3.

The next day, probation agents and law enforcement searched the defendant and his home. Id. The defendant was taken into custody under an apprehension request filed by corrections officials when they approved the Search Plan. Id. After a protective sweep by law enforcement, Probation and Parole Agent Jason Luebke found, among other things, a safe, ammunition and

1

a firearm. Id. The probation agents then turned the search over to police officers. Dkt. No. 47 at 76, lines 5-20 (citing Exhibits 4, 5).

The defendant filed two motions to suppress. Dkt. Nos. 39, 40. The defendant's first motion sought an evidentiary hearing and an order suppressing all evidence as the fruit of an illegal search and seizure. Dkt. No. 39. The second motion asked the court to grant a Franks hearing and suppress the defendant's DNA and information from his cell phones. Dkt. No. 40.

Magistrate William E. Duffin issued two separate reports and recommendations. On March 3, 2023, Judge Duffin granted the defendant's first motion for an evidentiary hearing (Dkt. No. 29) and recommended that the court deny the defendant's second motion and request for a Franks hearing (Dkt. No. 30). Dkt. No. 42. The defendant did not object.

On March 27, 2023, Judge Duffin conducted the evidentiary hearing. Dkt. No. 45. Wood did not testify because she no longer works for the Community Corrections Department, but Wood's supervisor, Debra Rozier, testified, along with Luebke and a police sergeant who participated in the search. Dkt. No. 47 at 2. Judge Duffin allowed the parties to file post-hearing briefs. Dkt. No. 45.

In his May 3, 2023 report and recommendation, Judge Duffin recommended that the court deny the defendant's first motion to suppress. Dkt. No. 51 at 10. Judge Duffin found that the neighbor's tip constituted reasonable suspicion that agents would find evidence of a violation in the defendant's home. Dkt. No. 51 at 9. He noted that the agents' search had

uncovered a firearm and ammunition, which provided reasonable suspicion that the defendant had committed a crime and violated his terms of supervision. Id. at 9, 10. Judge Duffin reasoned that because the initial search by corrections officials was lawful, the subsequent search was lawful as well. Id. Finally, Judge Duffin concluded that there was no evidence that the search was arbitrary, capricious, harassing or otherwise unreasonable. Id. The defendant objected to the second recommendation. Dkt. No. 52.

The court will adopt the first recommendation (to which there was no objection) and deny the defendant's motion to suppress and request for a Franks hearing. As for the second recommendation, the court will overrule the defendant's objection, dkt. no. 52, adopt the recommendation, dkt. no. 51, and deny the defendant's motion to suppress, dkt. no. 29.

## I.    Defendant's First Motion to Suppress

A.    Defendant's Motion (Dkt. No. 29)

The defendant's first motion described three issues: (1) whether an uncorroborated tip from an unnamed, unknown informant justified a warrantless search of the defendant and his residence under the Fourth Amendment and 2013 Wisconsin Act 79; (2) whether the search was conducted in a reasonable manner; and (3) whether Milwaukee police officers acted reasonably in searching the residence without a warrant. Dkt. No. 29 at 2, 3. The defendant requested an evidentiary hearing. Id. at 3.

The defendant argued that his probation agent had relied on an uncorroborated tip from an unnamed, unknown informant. Id. at 18. In

support of the motion, he cited language from the Community Corrections

Home Search Plan:

> WITNESS STATED THAT EVER SINCE CLIENT WAS PLACED ON GPS MONITORING THROUGH HOC, THERE HAS BEEN A LOT OF ACTIVITY TAKING PLACE AT HIS RESIDENCE WHICH APPEARS TO BE DRUG RELATED. CLIENT HAS BEEN OBSERVED EXITING AND ENTERING THE BACKDOOR OF HIS RESIDENCE CARRYING A GUCCI OR LOUIS VUITTON MAN BAG WHICH THE WITNESS BELIEVES TO BE CARRYING DRUGS AND MONEY. DURING A CONVERSATION WITH THE CLIENT, THE WITNESS OBSERVED AN EXTENDED CLIP IN CLIENTS RIGHT POCKET. WHILE DISCUSSING THE RASH OF BREAK INS THAT HAVE BEEN OCCURING IN THEIR NEIGHBORHOOD, THE WITNESS STATED THAT CLIENT PATTED HIS POCKET WHERE THE EXTENDED CLIP WAS AND STATED, "THAT'S WHY I KEEP PROTECTION ON ME."

Id. at 4.

The defendant also attacked the reasonableness of the search. Id. at 27.

He claimed that the officers engaged in a "large scale ransacking over several

hours of [the defendant's] 1st Floor, 2nd Floor, and Basement." Id. at 28. He

maintained that the apprehension request contained a false statement—that

the defendant was not on monitoring; he argued that the defendant was on

GPS monitoring, and that had the officers thought about this, they would have

questioned whether it was reasonable to think that the defendant's activity in

and out of the house was related to drug trafficking. Id. at 32-33. According to

the defendant, the law enforcement officers should have known the report was

untrue because he could not have exited and entered his back door without

triggering a GPS violation. Id. at 33. He argued that a reasonable officer would

have asked whether an "unverified and uncorroborated anonymous tip" was

4

sufficient to allow them to "start rooting around in the home without a warrant." Id.

B. Government's Response (Dkt. No. 35)

The government responded that the initial search was supported by the defendant's signed rules of supervision and the neighbor's tip that the defendant was violating those rules. Dkt. No. 35 at 9. It asserts that

> Rule ST 006 informs the defendant that he must, "make [himself] available for searches including but not limited to residence, property, computer, cell phone or other electronic device under [his] control." *See Exhibit #1* at pg. 1. Rule ST 103 requires that the defendant "obtain permission from [his] agent prior to purchasing, possessing, owning or carrying a firearm or other weapon, or ammunition, including incapacitating agent. An offender may not be granted permission to possess a firearm if prohibited under federal or state law." *See Exhibit #1* at pg. 2. The defendant is also prohibited pursuant to rule SP 006 from being "in the presence of any person who is in possession of a firearm (legal or illegal) including being in a residence or vehicle where a firearm is located." *Id.*

Id. at 10 (citing Dkt. No. 35-1 at 1, 2). 2. Given these rules, the government argued the neighbor's tip that the defendant was in possession of an extended magazine—for a firearm he kept on his person—provided reasonable grounds for the search. Id.

The government distinguished the initial probation search from the subsequent Act 79 search by law enforcement. According to the government, the probation department initiated, planned and executed the preliminary search of the residence and found evidence of the crimes and rules violations. Id. at 11. It argues that the defendant was covered by Act 79 because he was under supervision for Attempted Second Degree Intentional Homicide (while armed), which is a felony under Wis. Stat. §945.05(1). Id. at 12. The

5

government states that "Act 79 permits law enforcement to search the person, residence, or property of a person under the supervision of the Wisconsin DOC for a felony offense without consent or a warrant if there is reasonable suspicion that the person is committing, is about to commit, or has committed a crime or a violation of a condition of release." Id. (citing United States v. Ey Lao, No. 19-CR-0058, 2019 WL 2560507 (E.D. Wis. June 21, 2019)). The government emphasized that the neighbor's tip was sufficient to provide reasonable suspicion to believe that the defendant had violated the rules of his supervision, and that the police were not required to rely solely on the tip because by that time, the people who had conducted the probation search had observed contraband. Id.

Finally, the government claimed there was no evidence that the search was unreasonable or prolonged. Id. at 13. It asserted body camera footage showed that officers allowed a resident and a minor child to stay in the home, that another child continued her virtual schooling and that the officers were not loud, boisterous or harassing. Id. The government disputed the defendant's assertion that the search lasted for several hours, but noted that even if that had been true, that alone did not render the search unreasonable. Id.

C.    Defendant's Reply (Dkt. No. 40)

The defendant accused the government of downplaying importance of reasonableness. Dkt. No. 40 at 2. The defendant emphasized that the tip was unverified, uncorroborated and anonymous, and pointed to the factors enumerated by the Supreme Court in asserting that the tip did not meet those

6

factors. Id. at 7 (citing Florida v. J.L., 529 U.S. 266 (2000)). The defendant asserted that the government could not say whether the tipster was making up a story to enforce a grudge against the defendant, or whether the tipster was relating eye-witness knowledge, or whether the tipster's report was contemporaneous with the events described, or whether prior to starting the search corroboration for the tip had been provided, or whether there was an attempt to corroborate the tipster's claims prior to the search. Id. at 9-10.

As for the reasonableness of the search, the defendant argued that one of the body cam videos was at least two hours and thirty-six minutes in length and did not include the search of the second floor living room. Id. at 10.

## II. Defendant's Second Motion to Suppress and Request for a Franks Hearing

### A. Defendant's Second Motion (Dkt. No. 30)

The defendant's second motion to suppress challenged two affidavits. The first affidavit—signed by Milwaukee Police Officer Justin Schwarzhuber on September 10, 2020—sought a search warrant to obtain "DNA evidence on the person of Michael T. Shelton;" the second affidavit requested a warrant for a "white Samsung cell phone and a silver Apple iPhone 12." Dkt. No. 30 at 4. The defendant asserted that paragraph nine of that affidavit averred that "heroin was recovered;" the defendant argued that this statement was false and that probation officials did not recover heroin in the September 2, 2020 search. Id. at 5. The defendant also argued that both the first and second affidavits "omitted any mention that the search of [the defendant's] residence was on the basis of an uncorroborated unverified tip from an anonymous informant to a

7

Department of Corrections Agent Heather Wood and that no independent investigation of the tip was conducted before the execution of the search to corroborate the claims in the tip." Id. at 5. Based on the alleged false statement and missing information, the defendant asked Judge Duffin to schedule a Franks hearing and that he suppress the defendant's DNA and information derived from the search of his cell phones. Id. at 9.

B.    Government's Response (Dkt. No. 36)

The government responded that the defendant had failed to make the requisite preliminary showing that the statements in or omitted from the affidavits were material to a finding of probable cause. Dkt. No. 36 at 1. The government asserted that to support a request for a Franks hearing, a defendant must make a "substantial preliminary showing" that: "(1) the affidavit contained a false material statement; (2) the affiant made the false statement intentionally, or with reckless disregard for the truth; and (3) the false statement is necessary to support the finding of probable cause." Id. at 5 (quoting United States v. Swanson, 210 F.3d 788, 790 (7th Cir. 2000)). The government emphasized that the court must "remove any overt falsehood from the affidavit" to determine whether probable cause remains. Id. (citing United States v. Daniels, 906 F.3d 673, 676 (7th Cir. 2018)).

The government conceded that paragraph nine contained a typographical error referencing heroin "rather than the marijuana that was in fact recovered" and that no heroin was recovered from the defendant's home; the government insisted, however, that the affiant did not make this misstatement intentionally

8

or even recklessly. Id. at 7-8. The government asserted that the statement in paragraph nine of the first affidavit "references back to paragraph two, where the recovery of the marijuana was described."[1] Id. at 8. The government described Schwarzhuber's typo as an "innocent mistake" and argued that the reference to the previous paragraph was "direct evidence of the officer[']s intention to describe that marijuana was the substance discovered." Id. The government also pointed out that the defendant "failed to include any facts or direct evidence regarding [Schwarzhuber's] state of mind or knowledge in not including the tip." Id. at 11. According to the government, the defendant never argued that Schwarzhuber was even aware of the tip or had any knowledge about the credibility of the tipster. Id.

C.    Defendant's Reply (Dkt. No. 41)

The defendant acknowledged that he faced a high hurdle in requesting a Franks hearing. Dkt. No. 41 at 1-2. He claimed, however, that he had made a showing of a false statement and the omission of any facts about the anonymous informant's tip. Id. at 2. The defendant reasoned that Scwarzhuber included the false statement about the heroin to gain an advantage and make it easier to obtain the warrant. Id. at 3. The defendant claimed that the omission of the tip had to be intentional because the anonymous tip would not have passed the constitutional prerequisites for probable cause. Id. at 4. The

---

[1] Although paragraph nine did reference paragraph two, paragraph two does not mention any drugs. It lists the individuals involved in the probation search. Dkt. No. 30-1 at 3, ¶2. Paragraph five of the affidavit, however, recounted that the upper living room area contained "multiple large bags containing suspected marijuana." Dkt. No. 30-1 at 3, ¶5.

9

defendant emphasized that he did not have to prove a <u>Franks</u> violation at the pretrial motions stage and that he was required only to make the substantial preliminary showing. <u>Id.</u> at 5-6.

## III.    First Report and Recommendation (Dkt. No. 42)

In his first report and recommendation, Judge Duffin granted the defendant's motion for an evidentiary hearing as to the first motion to suppress (the motion attacking the alleged "anonymous" tip) but recommended that this court deny the second motion (the motion seeking a <u>Franks</u> hearing). Dkt. No. 42. Noting that the parties' briefs had assumed that a search by law enforcement officials under Act 79 and a search by corrections officials of someone on extended supervision are legally distinct, Judge Duffin observed that the first search was conducted by corrections officials, but found that the distinction between the two types of searches was of "little consequence" in this case because either type of search was lawful only if supported by reasonable suspicion. <u>Id.</u> at 2. He recounted that a law enforcement officer may conduct an Act 79 search if that officer "reasonably suspects that the person is committing, is about to commit, or has committed a crime or violation of a condition of release to extended supervision." <u>Id.</u> at 2 (citing Wis. Stat. §302.113(7r)). He recounted that corrections officials may conduct a search of someone on supervised release if they have "reasonable grounds to believe the offender possesses contraband or evidence of a rule violation on or within his or her person or property." <u>Id.</u> (citing Wis. Admin. DOC §328.22(2)(a)).

10

Judge Duffin noted that the government did not timely respond to the defendant's request for an evidentiary hearing, which normally would prompt him to grant the request as unopposed. Id. at 3. On the other hand, Judge Duffin pointed out that the defendant had not "identified any facts that are in dispute as to what the officers knew or how they conducted their search." Id. at 4. Given *that*, he stated that he ordinarily would deny such a request. Id. In the end, Judge Duffin decided that he, himself, needed additional facts to resolve the motion to suppress. Id.

First, although the defendant had alleged that the tip had been stated "verbatim" in the Community Corrections Home Search Plan, Judge Duffin noted that the Plan did *not* contain the witness's words, but a corrections official's summary of the circumstances that led to the corrections search. Id. at 4-5. Second, Judge Duffin stated that although the parties' briefs had been packed with factual assertions, many of them were unsupported and he could not tell which were disputed. Id. at 5. Third, Judge Duffin noted that although the parties seemed to agree that the witness who gave the tip to corrections officials was "anonymous," "the fact that the witness [was not] identified in the Plan [did] not mean he or she was unknown to corrections officials." Id. at 6. He observed that even if the witness did not provide his or her name, "witnesses routinely provide details that lend credibility to their tip or that would enable law enforcement to know who the tipster was," even though those details may not be contained in official reports because of fears that the target could identify the tipster. Id. Judge Duffin could not tell who got the

11

information from the witness or when, what other details the witness may have provided and which details of the Search Plan came from corrections officials rather than the witness. Id. at 6–7.

Judge Duffin also concluded that he did not have enough facts to determine whether the search was conducted in a reasonable manner. Id. at 7. He indicated that he'd been provided bodycam video from an officer who stayed mostly in the living room with other residence of the home, although the defendant's brief referred to other bodycam footage that may not have recorded the entire search. Id.

With respect to the Franks hearing, Judge Duffin acknowledged that the reference to heroin was an obvious error because no heroin was recovered. Id. at 8-9. But Judge Duffin found the "errant reference to heroin in the affidavit" to be obviously immaterial to the existence of probable cause to search for the defendant's DNA. Id. Judge Duffin found that "[h]ad the affidavit correctly referred to marijuana instead of heroin it would have all the same established probable cause to obtain [the defendant's] DNA." Id. at 9-10. He concluded that even if the reference to drugs and packaging material had been omitted, and paragraph nine had said only that genetic material can be recovered from guns and matched to specific individuals, there still would have been probable cause to obtain the defendant's DNA. Id. at 10.

Judge Duffin also found that the record did not support the defendant's argument that the affidavits for both the DNA warrant and the phone warrant were based on "an uncorroborated unverified tip from an anonymous informant

to a Department of Corrections Agent Heather Wood and that no independent investigation of the tip was conducted before the execution of the search to corroborate the claims in the tip." Id. Judge Duffin reiterated that the record did not demonstrate that the tip had been anonymous or uncorroborated; that was the defendant's characterization of the information in the Search Plan. Id. He pointed out that even if the tip had been anonymous and uncorroborated, the defendant had not demonstrated that the affiant was intentional or reckless in leaving out that information. Id. He noted that the affiant was a police officer who had assisted in the search of the defendant's home at the request of a corrections officer and that the police officer would not necessarily have had reason to know what caused the corrections officers to search the home. Id. And, he noted, the defendant's arguments about the validity of reliance on the tip were "subsumed" in the first motion to suppress. Id.

Judge Duffin explained that the Franks motion depended on the defendant showing that the search was based on an uncorroborated, anonymous tip, and that omission of that detail would be material only if the search of the defendant's home was unlawful. Id. at 11. He reasoned that if the search of the defendant's home was unlawful, the seizures of the cell phones and firearm (on which his DNA was found) would be unlawful, the evidence would be suppressed and the warrant authorizing the search of the phones or the collection of the defendant's DNA would be immaterial. Id. On the other hand, Judge Duffin said, if the search was lawful, the omission of information about the tip would be immaterial. Id. Judge Duffin concluded that the

defendant "ha[d] failed to show that there [was] any basis for a *Franks* hearing or suppression under *Franks*" and recommended that this court deny the second motion to suppress. Id. The defendant did not object to this first report and recommendation.

## IV.  Hearing Testimony

At the March 27, 2023 evidentiary hearing, the government called three witnesses: (1) Debra Rozier; (2) Jason Luebke; and (3) Justin Schwarzhuber. Dkt. No. 47.

Rozier testified that she had been the corrections field supervisor for the Wisconsin Department of Corrections for the past seven years. Id. at 4, lines 17-20. Prior to that, she worked as a probation and parole agent for sixteen years. Id., line 23. At the time of the hearing, she supervised a unit of seven field agents, staffing cases, staffing violations, assigning new cases and keeping the agents in the loop with new initiatives. Id. at 5, lines 1-6. Rozier implemented department policies such as the community search plans, id. lines 10-25, and she was required to ensure that the department had enough information to corroborate the evidence in the community search plan, id. at 6, lines 10-24. Rozier said that the department does not proceed with a tip if it comes from someone whose prior tips have continually turned out to be inaccurate or false, such as in situations where significant others or ex-significant others are trying to get someone into trouble. Id. at 7, lines 7-19.

Rozier testified that, when deciding to authorize a search, she looks at the detail of the information provided, the relationship of the caller to the client

on supervision, the threat to public safety and whether the tip suggests an alleged rules violation. Id. at 8, lines 2-4; 9, lines 4-9. She also considers the client's prior history, offense history and the "whole scope" before taking the information to her own supervisor. Id. at 8, lines 4-7. Rozier considers it relevant if the tipster has firsthand information. Id. at 10, lines 14-22. Rozier testified that the assistant regional chief makes the final decision to approve the search after considering the same factors cited by Rozier. Id. at 8, lines 8-14.

Rozier testified that she supervised field agent Heather Wood in September of 2020 but that Wood had since left the Department of Corrections. Id. at 11, lines 17-25; 12, lines 1-11. Rozier testified that she knew that the defendant was on supervision for manslaughter when Wood received a tip on or about September 1, 2020 raising concerns that he was violating his terms of supervision. Id. at 12, lines 24-25; 13, lines 1-13.

Defense counsel objected to Rozier's testimony as hearsay within hearsay. Id. at 13, lines 14-19. Judge Duffin asked the government to rephrase the question and the government asked Rozier whether she had concerns that the defendant was in violation of his rules of supervision; Rozier responded in the affirmative. Id. at 13, lines 20-25; 14, lines 2-7. Rozier confirmed that the defendant had signed his rules of supervision and that the department kept the signed rules in the ordinary course of business. Id. at 14, lines 18-25; 15, lines 1-11. The government moved into evidence the rules of supervision, Exhibit 6; with no objection, Judge Duffin admitted them. Id. at 15, lines 13-18.

15

The government also moved into evidence Exhibit 7, the Community Corrections Home Search Plan for the defendant with Rozier's name on it as the approving supervisor. Id. at 20, lines 1-25. The government directed Rozier to the portion of the plan that contained a "witness statement." Id. at lines 9-11. Rozier acknowledged that the plan did not identify the witness by name. Id. at lines 16-19. But she testified that the person who provided the information had given a name and contact information to the Department of Corrections. Id. at lines 20-25. She testified that the person identified themselves as a neighbor of the defendant's. Id. at 23, lines 10-14.[2]

Rozier testified about the factors she felt made the call reliable. The caller had stated that the defendant was on GPS monitoring, which was the case. Id. at 24, lines 7-8.[3] The caller mentioned concern about traffic and activity going on at the defendant's house, and that the caller had had a conversation with the defendant about break-ins and things happening in the neighborhood and the defendant responded that that was why he kept protection on him and patted his pocket where there was an extended clip. Id. at 25, lines 9-16. Rozier said the department had considered that the relationship of the caller was a

_____

[2] After defense counsel objected on hearsay grounds, Rozier clarified that the department maintains confidential records that she reviewed and that she was aware the person who called Wood provided a contact phone number and described herself as a neighbor. Id. at 22, lines 8-25; 23 lines 1-14.

[3] After objection from defense counsel, the Assistant United States Attorney made a record that Rule 104 permits hearsay at an evidentiary hearing and that Rozier was testifying as to the effects that the statement would have had on her. Id. at 24, lines 21-25.

16

concerned citizen—someone concerned for the safety of the neighborhood with no other known motive for calling. Id., lines 17-21. Rozier deemed the information reliable enough to move forward, although she conceded that while the department had the caller's contact information, the caller was not contacted again prior to reviewing the Search Plan. Id. at 26, lines 5-20.

Rozier testified that law enforcement participates in community searches by going into the house first to do a sweep for the agents' safety; once law enforcement completes the search, corrections officials would go in and begin the search. Id. at 27, lines 9-18. In this case, the search was a "next day search"—the day after the neighbor called. Id. at 27, lines 19-25; 28, lines 1-2. Rozier explained that the urgency stemmed from the fact that (1) there was alleged firearm possession and (2) field agents were rarely conducting home visits during the pandemic. Id. at 28, lines 3-25; 29, line 1. Rozier confirmed that the defendant was on GPS monitoring through the House of Correction—not the DOC—as part of his sentence for a prior offense of fleeing/eluding. Id. at 29, lines 16-25; 30, lines 1-8.

Rozier testified that her name appeared on the apprehension request because she approved it and the apprehension request is a document kept by the DOC in the ordinary course of business. Id. at 31, lines 22-25; 32, lines 12-21. Judge Duffin admitted the apprehension request into evidence as Exhibit 8 without objection from the defense. Id. at 32, lines 22-25; 33, line 1. Judge Duffin took judicial notice of the fact that in Milwaukee County Circuit Court Case No. 03CF01756, the defendant had been convicted of attempted, second-

degree intentional homicide while armed. Id. at 33, lines 12-25; 34, lines 1-6. Rozier testified that it is particularly concerning to the department when someone is on supervision for a violent offense such as attempted homicide and the information in the tip is related to possession or threatened use of a firearm. Id. at 34, lines 12-15.

On cross-examination, Rozier confirmed that the tip she had described was received by Agent Wood (who no longer was at the department and was not testifying). Id. at 35, lines 14-25; 36, lines 1-8. Rozier clarified that the department did not know the GPS range that the HOC gave the defendant. Id. at 40, lines 15-21. She admitted that she did not know the neighbor tipster's exact words. Id. at 39, lines 6-9. Rozier testified that the form filled out by Wood indicated that the defendant was not on monitoring and that statement was incorrect. Id. at 42, lines 6-24. On re-direct, Rozier testified that Rule S2103 of the defendant's supervision rules prohibited him from possessing ammunition. Id. at 48, lines 1-6.

The government next called Wisconsin DOC probation and parole agent, Jason Luebke, who had worked for the DOC seventeen years and was assigned to the MCORP (formerly called the "absconder") unit. Id. at 49, lines 6-21. In that capacity, he served as a law enforcement liaison between the DOC and the Milwaukee Police Department. Id. at 50, lines 11-21. Luebke estimated that he had participated in "between 50 to 75" probation searches. Id. at 53, lines 5-11. Luebke explained the process for the probation search, beginning with an

18

allegation of noncompliance. Id., lines 14-24. Luebke's role was to assist agents in searching. Id. at 54, lines 23-24.

Luebke testified that he participated in the September 2, 2020 probation search at the defendant's home. Id. at 56, lines 6-13. He testified that the defendant answered the door after several knocks, and that Luebke also saw an adult female and a teenaged, or middle-school, female. Id. at 57, lines 7-25. The defendant stepped outside and was taken into custody under the apprehension request. Id. at 58, lines 4-7.

Luebke described the defendant's bedroom in the northeast corner of the home; he described observing loose ammunition on a dresser on which a safe also was located. Id. at 58, lines 19-22; 59, lines 13-22. Toward the east, he saw packaged firearm rounds, rifle rounds. Id. at 59, lines 22-25. Exhibit 2 in the hearing was a photo of the rounds; the court admitted the photo without objection. Id. at 60, lines 3-13. In the safe opened by the defendant's "significant other," Luebke saw a firearm and loose cash. Id. at 60, lines 19-23; 64, lines 5-7. At that point (approximately 25 minutes into the search), Luebke communicated with the other agents and turned the search over to law enforcement. Id. at 61, line 25; 62, lines 1-8. Luebke explained his understanding of the difference between a corrections search and an Act 79 search—primarily that the corrections search is performed by corrections staff and becomes an Act 79 search when corrections officials turn it over to law enforcement. Id. at 62, lines 24-25; 63, lines 3-19.

On cross-examination, Luebke testified that there were approximately six police officers on the scene and they were armed. Id. at 65, lines 18-25; 66, lines 1-14. He testified that he had reviewed the Community Corrections Home Search Plan via email prior to the search. Id. at 67, lines 7-15.

The government's third witness, Milwaukee Police Sergeant Justin Schwarzhuber, testified that he had been promoted from officer to sergeant on March 3, 2021. Id. at 71, lines 3-14. Before being promoted, Schwarzhuber worked in District Four's anti-gang unit, investigating violent crimes involving firearms and robberies; since being promoted, he had supervised some officers that did the same type of work. Id. at 71, lines 17-25. Schwarzhuber testified that he had conducted roughly fifty to 100 Act 79 searches. Id. at 72, lines 15-17. He explained that

> Act 79 search allows law enforcement to search a person, residence, place that is being controlled by that person if they are on probation or parole for any felony, certain misdemeanors, whether that's a gun crime or a drug crime, anybody placed on that supervision after December 14, 2013, would fit that criteria, and to conduct a search you'd have to have some sort of information that would reasonably believe that the offender is committing, has committing [sic], or is about to commit a crime.

Id., lines 6-14.

Schwarzhuber testified that he participated in the search at the defendant's house but was in plain clothes and not wearing a body camera on that day. Id. at 73, lines 3-5. He testified that the officers did not force entry into the house, and that the protective sweep was done prior to his arrival. Id., lines 13-19. On arrival, Schwarzhuber "was made aware" that the department had recovered some contraband in the bedroom. Id. at 73, lines 23-25; 74, line

20

1. An adult female and two juveniles were in the house when Schwarzhuber arrived and when the defendant was taken into custody; another female—the defendant's girlfriend—arrived later. Id. at 74, lines 11-22. Schwarzhuber said the defendant's girlfriend described the areas of the residence over which the defendant exercised control, and Schwarzhuber found male clothing and shoes, weights and a music studio in the upstairs area consistent with the defendant's use of that area. Id. at 75, lines 8-11, 23-25; 76, lines 1-4. Schwarzhuber searched that area and testified as to Exhibits 4 and 5, photos of the contraband recovered in the search (sealed bags with marijuana, a firearm magazine, a Glock style pistol with an extended magazine). Id. at 76, lines 5-23. Judge Duffin admitted the photos without objection. Id. at lines 24-25; 77, lines 1-4.

During the search of the upstairs, there were numerous empty, gallon-sized bags. Id. at 77, lines 7-8. Under a yoga mat with weights on the sides, there was a longer floorboard that appeared to have been manipulated. Id., lines 9-13. Schwarzhuber testified that he moved the yoga mat and simply picked up the floorboard and that he didn't need to use any tools; the contents of Exhibits 4 and 5 were recovered under the floorboard. Id., lines 14-22. Schwarzhuber said nothing was destroyed in the search but admitted things were in general disarray. Id., lines 23-25; 78, lines 1-8.

Schwarzhuber testified that the defendant's girlfriend told him she owned a Springfield XD .40 caliber firearm, but no such firearm was located during the search. Id. at 78, lines 21-25; 79, lines 1-8. The missing firearm influenced

the length and scope of the search because the officers were trying to locate that firearm in the home, and the firearms that were located in the home were not hers. Id. at 79, lines 9-17. Schwarzhuber estimated that he was in the house "probably a couple hours." Id., lines 22-24. He said that it would not be abnormal for the search to proceed for that length of time based on the ammunition and controlled substances recovered. Id. at 80, lines 14-17. In addition, the discovery of the rifle rounds lengthened the search because it led officers to believe there was a rifle hidden somewhere inside the house. Id. at 80, lines 18-25; 81, lines 1-5.

On cross-examination, Schwarzhuber testified that four other officers who participated in the search were in uniform and had body cameras, but that he did not ask them to come upstairs with him during his search of the upstairs because they were involved in other parts of the search. Id. at 84, lines 9-19. Defense counsel pointed out that a photo admitted into evidence (he did not identify the exhibit number, but later questions imply it may have been Exhibit 5) had been taken with a digital camera. Id. at 88, lines 16-25. Schwarzhuber later testified that it wasn't abnormal that the only photographic evidence from the second floor was from a digital camera rather than a body camera. Id. at 91, lines 20-24. He testified that he believed the search took between two and a half to three hours. Id. at lines 13-14. And he verified that the inventory from the search of the second floor did not include a Gucci or Louis Vuitton man bag. Id. at 91, line 25; 92, lines 1-6.

The parties requested additional time to file post-hearing briefs. Id. at 94, lines 23-25; 95, lines 1-25; 96, lines 1-5.

**V.     Post-Hearing Briefs**

A.     <u>Defendant's Brief</u> (Dkt. No. 48)

In his post-hearing brief, the defendant argued that the government had failed to meet its burden in establishing that the search was based on reasonable grounds under Wisconsin Admin. Code §DOC 328.22. Dkt. No. 48 at 3. The defendant further argued that the government had failed to meet its burden to show that reasonable suspicion existed to apprehend the defendant and search his residence without a warrant. <u>Id.</u> Finally, the defendant argued that the government had failed to establish that the search was conducted in a reasonable manner and was not arbitrary, capricious or harassing under the requirements of Act 79 searches. <u>Id.</u> at 3-4.

The defendant focused on two individuals who were not called to testify at the hearing: the neighbor and Wood. <u>Id.</u> at 4-5. The defendant noted that Rozier could testify only that "she was aware of the telephone number and the name of the informant and that the informant claimed to be a neighbor." <u>Id.</u> at 5. He asserted that Rozier did not corroborate or investigate the information. <u>Id.</u> The defendant asserted that this demonstrated the department did not have reasonable grounds" for a search. <u>Id.</u> at 6. And he argued that the information did not provide reasonable grounds or suspicion for the Act 79 search. <u>Id.</u> at 7. The defendant asserted that Luebke's testimony did not add much to the government's case regarding reasonable grounds to search or the

23

reasonableness of the search itself, because was present and involved in the search for only a limited time and to a limited extent. Id. at 7-8. The defendant argued that Schwarzhuber's testimony confirmed that no officer asked for the grounds supporting the search or questioned whether the person who provided the tip should be believed. Id. at 8.

The defendant contrasted the facts of this case with the facts of United States v. Slater, No. 21-cr-106-pp, 2022 WL 558097 (E.D. Wis. Feb. 24, 2022), in which police officers conducted their own investigation, pulled the garbage, matched license plates and even searched Facebook before obtaining an apprehension request. Id. at 10-13. The defendant also reminded the court that the defendant had been on GPS monitoring and asserted that he "could not have engaged in the suspected drug activity without leaving the home and triggering a violation of his GPS." Id. at 15. He asserted that it wouldn't have required much effort for someone to just conduct surveillance on his home before launching a search. Id. at 15-16.

The defendant argued that the government was relying on what Wood told Rozier, which "amounts to little difference than an anonymous tip." Id. at 18. The defendant asserted that the government did not know know whether the tipster was reliable and credible, whether the tipster was making up the claim based on a grudge against the defendant, whether the tipster asserted eyewitness knowledge or what the tipster heard from someone else or whether the tipster was reporting contemporaneously with the event. Id. at 19.

24

The defendant argued that when he issued his original report and recommendation (Dkt. No. 42), Judge Duffin did not have enough facts to determine whether the search was conducted in a reasonable manner, reiterating Judge Duffin's statement that he had bodycam footage from only a single officer who stayed downstairs. Id. at 20. The defendant asserted that the hearing testimony did not remedy that situation, arguing that Schwarzhuber could "only guess as to how long the search lasted," while the defendant continued to maintain that the search was unreasonable "because it lasted far more than 2 hours and 36 minutes." Id. The defendant argued that "[g]iven the sheer scope and number of rooms searched and contraband recovered, the police were searching [the defendant's] home unreasonably for hours and hours." Id.

B.    Government's Response (Dkt. No. 49)

The government responded that the neighbor's tip about the defendant being in possession of a high-capacity magazine and engaging in drug sales provided reasonable suspicion that he violated several rules of his supervision. Dkt. No. 49 at 2. The government argued that Rozier, a DOC agent with significant experience, testified about how she analyzed the reliability of the allegations as they pertained to the defendant's "life, character and circumstances." Id. at 7. The government recounted that Rozier explained that when an agent she supervises wants to conduct a home search, she reviews the information and determines whether it should be taken to the next level for final approval. Id. The government noted that Rozier said she considered that

25

the defendant had previously committed a crime of violence using a firearm, that the tip came during the height of the pandemic when offenders were not being closely monitored by way of home visits, that the tip involved a firearm and threat of violence, that the defendant recently had been placed on GPS monitoring and that the witness was detailed and the information was corroborated. Id. at 7-8. The government recounted that Rozier had testified that the witness identified the location of the ammunition in the defendant's right pocket, gave the brand name of the bags he used, reported the presence of an extended clip and was correct about him being on GPS; Rozier also had testified that the neighbor's information was based on firsthand knowledge because she had a face-to-face interaction with the defendant, she had no apparent motive to lie and she had provided her name and phone number. Id. at 8.

The government asserted that it was reasonable to infer that the informant was a neighbor—an honest citizen witness—and argued that there was nothing in the record to refute that fact. Id. The government argued that the search was tailored to the reasonable suspicion articulated in the tip, and that the officers "remained tailored to looking for evidence to substantiate the violations regarding the presence of guns and drugs." Id. at 12.

Regarding the defendant's argument that he could not have engaged in drug dealing without triggering a GPS violation, the government argued that the record was devoid of any evidence supporting that argument. Id. at 13. It recounted that Luebke had said that a "common home zone" was the perimeter

26

of a person's address, not the back door, and the government reminded the court that the defendant had objected to the government presenting evidence to rebut this argument. Id. at 13-14. The government argued that it was the fact that the tipping witness knew that the defendant was on GPS monitoring—a true fact—that lent credibility to that tip. Id.at 14.

As for the argument that no officer inquired of the corrections officers about the basis for the search, the government cited the collective knowledge doctrine, arguing that officers may conduct a search without firsthand knowledge of the facts underlying reasonable suspicion. Id. (citing United States v. Eymann, 962 F.3d 273, 283-84 (7th Cir. 2020) (citing Untied States v. Harris, 585 F.3d 394, 400 (7th Cir. 2009)). The government argued that the doctrine applied to information an officer receives from someone with the training, responsibility or authority to make a reasonable suspicion determination. Id.

The government argued the search was authorized by the Wisconsin DOC and that Luebke worked as a liaison between the DOC and the MPD. Id. at 14-15. Luebke reviewed the Search Plan, which included the citizen witness tip, the history of dangerousness of the defendant, the potential occupants in the residence and that the MPD District 4 anti-gang unit would be present to secure the residence and stand by if weapons or were found. Id. at 15. Moreover, Schwarzhuber had conducted between fifty and 100 Act 79 searches and learned, on arrival, that the DOC had located contraband in the defendant's room. Id.

27

The government also cited the doctrine of inevitable discovery. Id. at 15-16. It pointed out that the MPD had possession of the apprehension request and was authorized to conduct a protective sweep. Id. at 16. They knew the defendant was in possession of ammunition, that he was on supervision for a crime of violence, that he had committed another felony offense on supervision, that he had communicated a threat of violence in the future, that he had delayed coming to the door and that they observed ammunition in plain view on the dresser in his bedroom. Id. at 17.

Finally, the government asserted that the search was reasonable and not arbitrary. Id. It emphasized that Rozier had testified that the search was based on a reliable tip from a concerned citizen who made observations and had conversations with the defendant. Id. Schwarzhuber had testified as to the manner in which the search was conducted. Id. He had testified that the defendant's girlfriend had identified a firearm that belonged to her but that was not where it was supposed to be and ultimately never was found. Id. at 18. Officers found numerous rounds of rifle ammunition but no rifle. Id. Based on the totality of the circumstances, the government argued that it was reasonable for the Act 79 search to take as long as it did and for officers to recover the multiple firearms, magazines, hundreds of rounds of ammunition and pounds of marijuana. Id. The government further argued that the search was not capricious or harassing and that the number of officers involved was not excessive. Id. There were, at most, six officers on the scene and no one forced entry. Id. at 19.

28

C.     Defendant's Reply (Dkt No. 50)

In his reply, the defendant continued to stress the "importance of the decision" in Slater, asserting that that decision is "a template for all the laudable efforts law enforcement should take before launching a home search under Act 79 and the reasonable grounds which would support a probation agent's decision to approve an apprehension request and probation search." Id. at 10. The defendant argued that the collective knowledge doctrine did not apply, because DOC officials are not police officers and do not have specialized training, responsibility or authority to make a determination of reasonable suspicion. Id. at 11.

The defendant maintained that the inevitable discovery doctrine had no application because the information in the tip did not support a search without a warrant and the officers made no attempt to get a warrant. Id. at 13. The defendant asserted that the arrest was unlawful, that the officers kept the defendant in a car a distance from the home and that no one in the home posed a danger. Id. at 13-14. The defendant insisted the government had failed to show that it would have obtained an independent justification for the search that would have led to the discovery of the evidence and that it would have conducted a lawful search but for the challenged conduct. Id. at 17.

**VI.     Second Report and Recommendation (Dkt. No. 51)**

Judge Duffin began his analysis with a discussion of Wis. Admin. Code §DOC 328.22(2)(a), which allows corrections officials to search the home of a person on extended supervision if there is reasonable suspicion that the

person's home contains contraband or evidence. Dkt. No. 51 at 4. He noted that the defendant's rules of extended supervision prohibited him from possessing a firearm or ammunition, and that because the defendant had a felony conviction, possession of a gun or ammunition also would constitute a violation of the condition that he not commit any new crimes while on supervision. Id.

Judge Duffin acknowledged that neither the neighbor nor Wood testified at the hearing. Id. at 5. He recounted that he had heard from Rozier, Wood's supervisor, who testified that Wood told her about the conversation with the neighbor and related the contents of what Wood wrote in the reports. Id. He recounted that he also had received the Community Corrections Home Search Plan drafted by Wood. Id. (citing Dkt. No. 47 at 12; Ex. 7). The court noted that it was unclear which details in that plan were provided by the neighbor and which were supplemented by Wood. Id.

Characterizing this as a "multi-layered hearsay problem," Judge Duffin wrote that neither party had addressed it in their post-hearing briefs. Id. He found it unnecessary to address the issue other than to note the general principle that probable cause or reasonable suspicion may be founded on hearsay, id. (citing Franks v. Delaware, 438 U.S. 154, 165 (1978)), and that information based on multiple layers of hearsay may be sufficient if it is reliable, id. (citing United States v. Hollingsworth, 495 F.3d 795, 805 (7th Cir. 2007)). Judge Duffin commented that Wood and Rozier had no apparent motive to be untruthful; he noted that their careers and professional reputations

30

depend on honesty. Id. at 6. He concluded that whether reasonable suspicion had existed came down to the sufficiency of the information provided by the neighbor, and he applied the "well-established framework" for assessing the sufficiency of information provided by informants. Id. at 6.

Judge Duffin explained that a court considers the totality of the circumstances, paying particular attention to the degree of police corroboration, the informant's firsthand knowledge, the detail provided and the time between the reported events and the warrant application. Id. (citing United States v. Orr, 969 F.3d 732, 736 (7th Cir. 2020)). Judge Duffin made clear that the tipster had identified herself and provided contact information; she was a neighbor, *not* an anonymous tipster. Id. He explained that the neighbor's information suggested that she was fairly familiar with the defendant—the two were neighbors, they knew each other well enough to have a conversation about neighborhood problems, she knew the defendant was on supervision and she knew he was on GPS monitoring. Id. at 7. Judge Duffin saw no evidence that the neighbor harbored a grudge. Id. He found it unsurprising that the neighbor had not provided information—reliable or otherwise—in the past, because she was not a "traditional police informant who was providing information in consideration of some personal benefit." Id. Rather, he found that by all appearances, the neighbor was a concerned citizen who cared about the safety of her neighborhood, and noted that such witnesses "are generally assumed to be more reliable than the prototypical police informant." Id. (citing Edwards v. Cabrera, 58 F.3d 290, 294 (7th Cir. 1995)).

Judge Duffin acknowledged that the corrections officials' verification of the neighbor's information was minimal. Id. They verified only that the defendant was on electronic monitoring; Judge Duffin disagreed with the defendant, however, that the report of him entering and exiting the home was inconsistent with GPS monitoring. Id. at 7-8. He noted that the defendant was on GPS monitoring through *Milwaukee County*, independent of his state supervision, so state corrections officials would not have known the limits of the monitoring; Judge Duffin concluded that it "would be entirely reasonable for corrections officials to presume that his conditions were not so strict as to bar him from ever stepping outside his home." Id. at 8.

Judge Duffin commented that the neighbor provided "somewhat detailed" information such as providing the context under which she had seen the defendant with the extended magazine. Id. He observed that the information from the neighbor was fresh; the search occurred only one day after the neighbor's call to Wood. Id. While it wasn't clear how much time passed between the neighbor's conversation with the defendant and her call to Wood, Judge Duffin observed that the defendant had been placed on GPS monitoring on August 13, 2020, just under three weeks before the search. Id.

Mindful that reasonable suspicion is a relatively low burden, Judge Duffin found that the neighbor's tip gave corrections officials "more than a mere hunch that evidence of a violation of his conditions of release would be found in his home," and concluded that the "marginal nature of the information provided" actually bolstered the veracity of that information. Id.

32

Judge Duffin reasoned that a person with a grudge would be likely to offer a more compelling report much more likely to trigger a response from corrections officials. Id. at 8-9. Judge Duffin concluded that the defendant's statement that he kept "protection" on him supported the inference that he possessed a firearm, and that it was reasonable to suspect that a person would keep a firearm in his home. Id. at 9. Thus, Judge Duffin concluded that corrections officials had reasonable suspicion for searching the defendant's home. Id.

He next turned to the Act 79 search by law enforcement. Id. Judge Duffin pointed out that before the police took over and began the Act 79 search, the corrections officials had told police that they had found a firearm and ammunition. Id. at 9-10. Judge Duffin reasoned that that information provided the police with reasonable suspicion that the defendant had both committed a crime and violated the conditions of his supervision; because he found that the initial search by corrections officials was lawful, Judge Duffin concluded that the Act 79 search by law enforcement officers also was lawful. Id. at 10.

Judge Duffin found nothing to support the assertion that the search was arbitrary, capricious or harassing or that it was otherwise unreasonable. Id. He stated that the scope and the duration were reasonable and that officers were entitled to conduct a thorough search, which takes time. Id. Judge Duffin cited Schwarzhuber's testimony that the scope and length of the search were typical of dozens of Act 79 searches in which he participated. Id. (citing Dkt. No. 47 at 72, 79-80).

33

Judge Duffin recommended the court deny the defendant's motion to suppress. Id.

## VII. Objection to Second Report and Recommendation and Response

A.    <u>Defendant's Objection</u> (Dkt. No. 52)

In a thirty-four-page document, the defendant objected to "all of the findings of fact and conclusions of law" in the second report and recommendation. Dkt. No. 52 at 20. He stated that in doing so, he was incorporating each of the arguments he had made in each pleading related to the first motion to suppress—Dkt. Nos. 29, 40, 48, and 50. Id. at 20-21. He then presented thirteen pages of single-spaced objections to specific portions of Judge Duffin's report. Id. at 21-34. According to the defendant, the two individuals who were not called by the government make the case for suppression. Id. at 15.

The defendant specifically argued the following:

- Judge Duffin erred in finding that neither side had addressed the multi-layered hearsay problem in the post-hearing briefs. The defendant asserted that he had objected during the testimony of Rozier (citing dkt. no. 47 at 4-35) and that his post-hearing brief is "rife with his complaints about the completely hearsay nature of the government's failure to make its case" (citing Dkt. No. 48 at 4-6). Id. at 21-22.

- Judge Duffin erred when relying on <u>United States v. Hollingsworth</u>, 495 F.3d 795, 805 (7th Cir. 2007) for the proposition that multiple layers of hearsay may be sufficient if they are reliable. The defendant asserted that neither the hearsay tip nor the hearsay from Wood were reliable because the information never was vetted or corroborated, the summary in the Community Corrections Home Search Plan doesn't clearly state which information came from the witness and Wood and Rozier made no attempt to corroborate the tip. (citing Dkt. No. 47 at 4-49, Ex. 7.) Id. at 22-23.

- Judge Duffin erred in finding that "the neighbor's tip supported reasonable suspicion that evidence of a violation of [the defendant's] rules of supervision would be found in his home." (citing Dkt. No. 51 at 9). According to the defendant, it wasn't enough for Judge Duffin to find the tip trustworthy because of the "speculative conclusion[s]" that the witness mentioned GPS monitoring or said she saw a magazine protruding from the defendant's pocket rather than a more compelling statement. Id. at 24-26.

- Judge Duffin erred in making findings that an uncorroborated tip amounted to reasonable suspicion of rule violation. Citing Navarette v. California, 572 U.S. 393 (2014), the defendant argued that the factors tip the scales in his favor because there is no information that the report was contemporaneous with the event and the witness did not use the 911 system (which would have permitted call tracing). Id. at 26-28.

- Judge Duffin failed to discuss this court's decision in United States v. Slater, Case No. 21-cr-106 (E.D. Wis. Feb. 24, 2022), which the defendant said sets the standard for what is expected of officers and corrections agents in Act 79 violation. There was no attempt in this case to vet or corroborate the information and no continued information from the defendant. There were no attempts to examine Facebook, conduct garbage searches and conduct surveillance. Id. at 28-31.

- Judge Duffin failed to consider that the Milwaukee Police Officers neglected to determine if reasonable suspicion was present before entering his home. Id. at 31.

- Judge Duffin erred because there was no corroborative information about the tip and Judge Duffin was unable to say whether the tipster was reliable or credible or had a grudge against the defendant. Id. at 32.

- Judge Duffin erred in making findings about the scope and duration of the search because the only bodycam video showed an officer staying in the living room and there was insufficient testimony to conclude that the search was reasonable. The defendant argued that "[g]iven the sheer scope and number of rooms searched and contraband recovered, the police were searching Shelton's home unreasonably for hours and hours." Id. at 32-33.

35

B.    Government's Response (Dkt. No. 53)

The government noted that Judge Duffin overruled the defendant's objections to hearsay during the evidentiary hearing. Dkt. No. 53 at 2. It recounted that when Rozier testified about the contents of the tip as reported in the community corrections plan and the defendant objected on grounds that it was "hearsay within hearsay," Judge Duffin overruled the objection. Id. at 6. According to the government, the defendant has not shown that the testimony would be inadmissible because Federal Rule of Evidence 803 allows for the admission of records of a regularly conducted activity. Id. The government argued that the tip was recorded by DOC Agent Wood and kept in the ordinary course of business by the DOC Probation Department. Id. at 7.

The government defended Judge Duffin's findings regarding reasonable suspicion, asserting that Wisconsin parolees and probationers do not enjoy the same degree of privacy expectations as ordinary citizens. Id. (citing State v. Guzman, 480 N.W. 2d 446, 599–600 (Wis. 1992)). The government recounted the applicable rules of supervision, then noted that Judge Duffin had concluded that the neighbor's tip gave officials "far more than a mere hunch that evidence of a violation of his conditions of release would be found in his home" and that he had reasoned that the neighbor was a concerned citizen. Id. at 8.

The government cited Rozier's testimony about the process she used to analyze the reliability of the witness's allegations. Id. at 9. It emphasized that she supervised seven agents, reviewed and approved community search plans

as part of her job and considered DOC policy and the Wisconsin Administrative Code. Id. It recounted that Rozier looked at the level of detail in the tip, the identity of the caller, whether the information presented a public safety issue the offender's prior record and the offense of conviction. Id. It reiterated that if Rozier found reasonable grounds for a search, she forwarded the request to the Assistant Regional Chief for further approval. Id. The government noted that Rozier specifically testified that the relationship of the tipster is important. Id. at 9-10. It recounted that in this case, she had considered that the defendant's offense of conviction was a crime of violence, that the tip came during the height of the pandemic during which offenders were not being closely monitored, that the defendant had committed a felony offense (fleeing) while on the same term of supervision, that the tip involved a firearm and a threat of violence and that the defendant recently had been placed on GPS monitoring as a result of fleeing. Id.

The government argued that courts draw distinctions between tips from ordinary citizen witnesses, anonymous tipsters and police informants. Id. at 10-11. The government argued that it is reasonable to infer that the neighbor was an ordinary citizen witness when there is nothing to refute that assertion. Id. at 11 (citing Illinois v Gates, 462 U.S. 213, 240 (1983)).

The government accused the defendant of holding the officers to a higher standard under Act 79 than that which is required by law. Id. at 12. The government asserted that the defendant failed to see critical differences

37

between this case and <u>Slater</u>, where the tipster had reached out to law enforcement rather than probation. <u>Id.</u>

As for the argument that officers should have interrogated the corrections department about the basis for the search, the government argued that the Wisconsin DOC authorized the probation search and apprehension request. <u>Id.</u> at 13. It asserted that Luebke, who worked as a liaison between the DOC and the MPD, reviewed the Search Plan and considered the tip, the history of dangerousness of the defendant and the potential occupants; he also made sure that officers would be present. <u>Id.</u> at 14. Finally, the government noted that Schwarzhuber testified that he had conducted between fifty and 100 Act 79 searches and learned of the contraband in the defendant's bedroom when he arrived on the scene. <u>Id.</u>

The government argued that there were no facts to support the defendant's assertion that the search was too long, and thus unreasonable. <u>Id.</u> at 14. It asserted that the search was not arbitrary because it was based on a reliable tip from a concerned neighbor who had eyewitness observations and conversations with the defendant. <u>Id.</u> at 15. It emphasized that Schwarzhuber testified that the manner of the search was reasonable given the allegations that the defendant possessed an extended magazine for a firearm, his girlfriend's firearm was not found where it was supposed to be and agents recovered rounds of rifle ammunition but had not found a rifle. <u>Id.</u> The government added that nothing about the search was harassing; the bodycam footage showed polite and respectful interactions and there were—at most—six

38

officers on the scene. Id. at 16. According to the government, there was no missing body camera footage because Schwarzhuber testified that he and his partner conducted the search in plain clothes. Id. at 16-17.

The government refuted any challenge to the defendant's arrest because Wisconsin Admin. Code §DOC 328.27(2) allows an offender on supervision to be taken into custody and detained for an investigation of an alleged violation of a rule or condition of supervision. Id. at 17.

Finally, the government dismissed the defendant's efforts to undermine the neighbor's tip as unreliable based on her comments about him coming and going from his house; the defendant had argued that if this were true, he would have triggered a GPS violation by stepping outside his back door. Id. at 18. The government pointed out that Luebke had testified that a common "home zone" perimeter is the offender's address rather than an offender's back door. Id. It noted that Rozier testified that the GPS monitoring was handled by another agency and was not a factor in her approval of the Search Plan. Id. The government argued that it was the fact that the neighbor knew that the defendant was on GPS monitoring—which he was—that lent credibility to the witness's information. Id.

## VIII.  Legal Standard

Federal Rule of Criminal Procedure 59(b) governs a district court's referral of motions to dismiss to magistrate judges. Parties have fourteen days to file "specific objections" to a magistrate judge's report and recommendation to a motion to dismiss. Fed. R. Crim. P. 59(b)(2). The district judge must review

39

*de novo* the portions of the magistrate judge's recommendations to which a party timely objects. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2), (3). The court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1).

If the defendant does not object, or makes only a partial objection, the district judge reviews the portions to which the defendant did not object for clear error. Fed. R. Crim. P. 59(b); <u>Johnson v. Zema Sys. Corp.</u>, 170 F.3d 734, 739 (7th Cir. 1999) (also noting that a party who fails to object to the report and recommendation waives appellate review of the factual and legal questions).

## IX.  Analysis

A.    <u>First Report and Recommendation</u> (Dkt. No. 42)

The court will adopt Judge Duffin's March 3, 2023 recommendation regarding the second motion to suppress and request for a <u>Franks</u> hearing, because Judge Duffin's recommendation is not the result of clear error.

A defendant is entitled to a <u>Franks</u> hearing only if he makes a "a substantial preliminary showing that: (1) the affidavit contained a material false statement; (2) the affiant made the false statement intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to support the finding of probable cause." <u>United States v. Maro</u>, 272 F.3d 817, 821 (7th Cir. 2001). "Franks hearings are 'rarely held' because '[t]hese elements are hard to prove.'" <u>United States v. Dessart</u>, 823 F.3d 395, 402 (7th Cir. 2016) (quoting <u>United States v. Swanson</u>, 210 F.3d 788, 790 (7th Cir. 2000)).

40

A substantial preliminary showing as to the intentionality or recklessness of omissions requires either "direct evidence of the affiant's state of mind or circumstantial evidence that the affiant had a subjective intent to deceive based on the nature of the omissions." United States v. Glover, 755 F.3d 811, 820 (7th Cir. 2014). This evidence "must show that the officer submitting the complaint perjured himself or acted recklessly because he seriously doubted or had obvious reason to doubt the truth of the allegations." United States v. Johnson, 580 F.3d 666, 670 (7th Cir. 2009).

The defendant did not object to this recommendation, which means the court reviews Judge Duffin's conclusions for clear error. Judge Duffin did not commit clear error. First, there is no evidence that the affiant's incorrect reference to "heroin" in the affidavit in support of the warrant for DNA evidence was intentional or reckless. The court agrees that the affidavit contained an obvious error. Paragraph nine stated:

> Affiant knows that genetic material may be obtained from the firearm and the packaging that the heroin was recovered in as described in paragraph 2, and that efforts to do so have or will occur by qualified law enforcement officers, and said material can be subsequently determined to be consistent or inconsistent with the genetic material of [the defendant].

Dkt. No. 30-1 at 4, ¶9. Paragraph two of the affidavit, however, did not mention heroin—or marijuana, guns or any other contraband; it listed the individuals involved in the September 2, 2020 probation search. Id. at 3, ¶2.

That error might have been significant if it was the affidavit's only reference to contraband from which genetic material might have been obtained. But paragraph four of the affidavit explains that inside the safe in the bedroom

41

the defendant shared with his girlfriend were located a black HiPoint .45 caliber firearm with an extended magazine, boxes of .223 caliber rifle ammunition, .45 caliber ammunition and loaded firearm magazines. Id. at 3, ¶4. Paragraph five recounted that a search of the upper living room area revealed a Glock 9mm handgun with a thirty-one-round extended magazine and "multiple large bags containing suspected marijuana," which subsequent testing provided to be 991 grams of THC and two handgun magazines. Id. at ¶5. Paragraph six revealed that the defendant had a felony conviction and therefore could not possess guns. Id. at 4, ¶6.

Though paragraph nine incorrectly stated that genetic material could be obtained "from the packaging that the heroin was recovered in as described in paragraph 2," the commissioner—and anyone else reading the entire affidavit—could see by looking at paragraph two that it did not reference heroin; a reader also easily could see from the other paragraphs referenced above that there *were* present in the residence firearms from which genetic material could be obtained, and that there *were* present in the residence bags of marijuana from which genetic material could be obtained. Reading paragraph nine in the context of the entire affidavit, the reference to "heroin" stands out as a typographical error because there is no other reference to heroin, no indication that officers found heroin and no reference to any drugs in the cross-referenced paragraph.

The affiant had no need to toss in a reference to heroin to convince the commissioner to issue the search warrant. The affidavit explained that the

42

defendant had a prior felony conviction (a fact the defendant has not contested), which means that he could not possess or live with guns or ammunition. The affidavit revealed that there were two guns (with extended magazines), multiple rounds of ammunition and magazines in the house where the defendant was living. The affidavit also reveals the presence of an illegal controlled substance—marijuana—in the house. Tossing in the word "heroin" without more added nothing to the fact that there were numerous items of contraband found in the residence capable of carrying genetic material.

Nor is there any evidence that the affiant intentionally included the word "heroin" to lure the commissioner into issuing a warrant he otherwise would not have issued. If the affiant *had* intended to mislead the commissioner, he could have done a better job of it. He might have said that the bags in the upstairs living room contained heroin, not marijuana, and he might have pointed the commissioner to the paragraph that actually referenced the drugs that *were* in the house. But again, there was no need for him to do so. Ignoring the erroneous reference to heroin, the affidavit still provided more than reasonable suspicion for a DNA search; it provided probable cause. If the commissioner missed the obvious signs that the reference to heroin was a typographical error, and somehow believed that there was heroin packaging material that could have contained genetic material, he would have considered that *in addition to* the evidence that the house contained multiple forms of contraband that could have contained genetic material—guns, bullets, magazines and baggies of marijuana.

43

To the extent that the defendant argued that both affidavits failed to state that the search of the defendant's home was based on an "anonymous informant's tip," dkt. no. 41 at 2, that is not an accurate representation of the record. As the court will discuss in analyzing the defendant's objections to the May 3, 2023 report and recommendation, the person who provided the information that led the corrections officials to conduct a search was *not* anonymous nor was she an informant. She was a neighbor who provided Wood with her name and contact information and who recounted to Wood her personal observations. More important, the defendant has identified no evidence of an intent to deceive and no need for the officer to lie or be reckless with the truth when the firearms were recovered. Indeed, it is not clear to this court why affidavits in support of warrants to obtain the defendant's DNA and to search phones seized during the search would need to contain information about what caused the corrections officials to conduct the search that led to the Act 79 search that yielded the contraband and the phones.

The court will adopt Judge Duffin's report and recommendation (Dkt. No. 42) and will deny the second motion to suppress (Dkt. No. 30).

B.      <u>Second Report and Recommendation</u> (Dkt. No. 51)

Turning to the defendant's objections to the May 3, 2023 report and recommendation, the defendant objects to "all the findings of fact and conclusions of law in the Report and Recommendation as erroneous." Dkt. No. 52 at 20. This objection is profoundly unhelpful. *All* of Judge Duffin's findings of fact and conclusions of law cannot be wrong. He found, for example, that

44

Wis. Admin. Code DOC § 388.22(2)(a) allows corrections official to search the home of someone on extended supervision if there is reasonable suspicion that that person's home contains contraband or evidence of a rule violation. Dkt. No. 51 at 4. That is not wrong, or even objectionable; §388.22(2)(a) says, "A search or seizure is appropriate and consistent with the goals and objectives of supervision under any of the following circumstances: . . . When an employee has reasonable grounds to believe the offender possesses contraband or evidence of a rule violation on or within his or her person or property." Judge Duffin cited numerous cases defining reasonable suspicion; one can go to Westlaw or LEXIS and look up the cases and see that his account of the holdings in those cases is neither wrong nor objectionable. He found that the neighbor who provided the information to Wood did not testify at the evidentiary hearing (Dkt. No. 51 at 5); not only is that not wrong or objectionable, but the *defendant* has asserted as much multiple times.

Making a blanket statement that one objects to "all" a magistrate judge's findings of fact and conclusions of law, and incorporating by reference every argument one has made in every pleading that preceded the objection, appears to be an attempt to avoid the specificity requirement of Fed. R. Evid. 72(b)(2), which requires an objecting party to file "specific written objections" to the magistrate judge's proposed findings and recommendations. There are reasons for the specificity requirement. Specificity "provides a district court judge with notice as to which issues are being contested and therefore adequately deals

with the sandbagging problem." <u>Johnson v. Zema Systems Corp.</u>, 170 F.3d 734, 742 (7th Cir. 1999).

> Such precision guides the district court in making [her] de novo review, directing the judge to precisely those lines of reasoning the party finds objectionable. Specifying the basis of a litigant's objections will also likely improve a litigant's chances of convincing a district court judge that the magistrate judge's analysis was in error.

<u>Id.</u>

The defendant has not invoked this court's obligation to conduct a *de novo* review of every, single finding of fact and conclusion of law in Judge Duffin's May 3, 2023 report and recommendation, particularly given that he is represented by able and experienced counsel who knows the rules. Pages 21-34 of the objections contain specific (albeit wordy and single-spaced) objections to particular findings, but even many of those objections overlap. Most of the objections focus on whether the neighbor's tip provided reasonable grounds or reasonable suspicion for the corrections officials' search and whether Rozier could testify about the tip, and the defendant objects to Judge Duffin's determination that the search was reasonable. The court will address *de novo* the specific objections it has been able to identify.

      1.    *Hearsay*

The defendant first objects to Judge Duffin's statement that neither side addressed the "multilayered hearsay problem in their post-petition briefs." Dkt. No. 52 at 21. The "multilayered hearsay problem," as discussed above, is the fact that the Search Plan prepared by Wood contained information provided by

the neighbor, and Rozier testified to those statements at the evidentiary hearing.

First, the defendant insists that he "complained and objected to the hearsay statements of Agent Heather Woods during the testimony of . . . Rozier" at the evidentiary hearing. Id. Next, the defendant asserts that his post-hearing brief was "rife" with complaints about "the completely hearsay nature of the Government's failure to make its case." Dkt. No. 52 at 21. He then recounts how he argued in his brief that the neighbor and Wood, neither of whom testified at the evidentiary hearing, "ma[d]e the case for suppression." Id.

The court will overrule this objection. The defendant is correct that he made hearsay objections *during the evidentiary hearing*, but Judge Duffin's report and recommendation did not say that neither party addressed the multilayered hearsay problem *at the evidentiary hearing*. It said that neither side addressed the problem in their *post-hearing briefs*. See Dkt. No. 51 at 5. That statement is correct. Though the defendant insists that his post-hearing brief was "rife" with something resembling hearsay objections, this court has reviewed every word of the defendant's post-evidentiary hearing opening brief at Dkt. No. 48. Nowhere in that brief does the word "hearsay" appear. Nowhere in the brief did the defendant cite Fed. R. Evid. 802, the rule that prohibits hearsay. The same is true of the defendant's reply brief in support of his post-hearing brief. Dkt. No. 50.

The defendant appears to believe that Judge Duffin should have inferred from the defendant's complaints about the government's failure to call the

neighbor and Wood as witnesses that he meant to challenge the court's ruling on his hearsay objections during the evidentiary hearing. There is no reason for Judge Duffin to have drawn such an inference. The defendant knew how to raise hearsay objections, because he did so during the evidentiary hearing. He could have specifically objected to Judge Duffin's hearsay rulings in his post-hearing briefing; he did not.

To leave the matter there would be coy, because the defendant's argument is designed to convince this court to make its own determination regarding whether the statements to which Rozier testified at the evidentiary hearing constituted inadmissible hearsay. The second specific objection the defendant raises is that Judge Duffin erred in "relying upon *United States v. Hollingworth*, 495 F.3d 795, 805 (7th Cir. 2007) for the proposition that multiple layers of hearsay may be sufficient provided it is reliable." Dkt. No. 52 at 22. In Hollingsworth, the Seventh Circuit noted that search warrants did not need to be based on first-hand observations and observed that "[i]f the individuals providing the informant's statement to the magistrate are reliable, then it makes little difference whether there are one or two levels of hearsay." Hollingsworth, 495 F.3d at 805 (citations omitted). The defendant's focus on whether the statements admitted at the suppression hearing were hearsay misses the point; as the Hollingsworth court noted, the question is not whether Judge Duffin based his decision on hearsay, but whether he based his decision on reliable information (although the two concepts are related; the prohibition against hearsay arises from concerns about reliability).

48

It long has been the case that "[a]t a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." United States v. Raddatz, 447 U.S. 667, 679 (1980) (citing United States v. Matlock, 415 U.S. 164, 172–74 (1974) and Brinegar v. United States, 338 U.S. 160, 172–174 (1949)). The Federal Rules of Evidence themselves state that they do not apply to a court's "determination, under [Fed. R. Evid.] 104(a), on a preliminary question of fact governing admissibility." Fed. R. Evid. 1101(d)(3). Rule 104(a) says that "[t]he court must decide any preliminary question about whether . . . evidence is admissible," and that in making that decision, it is not "bound by evidence rules, except those on privilege."

Did Rozier's testimony about Wood's out-of-court statements recounting the neighbor's out-of-court statements constitute hearsay under Fed. R. Evid. 801 and 802? Perhaps; during the evidentiary hearing neither party argued about possible applicable objections to the hearsay rule (although in its response to the defendant's objections to Judge Duffin's report and recommendation, the government argued that even if the Federal Rules of Evidence did apply, Wood's record of what the neighbor said would have been admissible as the record of a regularly conducted activity under Fed. R. Evid. 803(6),[4] Dkt. No. 53 at 6). But the hearsay rules did not apply at the

---

[4] The court need not determine whether, if the Rules of Evidence did apply at suppression hearings, the Search Plan would have been admissible as a record of a regularly conducted activity under Rule 803(6).

evidentiary hearing, so Judge Duffin was correct in overruling the defendant's hearsay objections.

Although the defendant uses the word "hearsay" in his first two objections to Judge Duffin's report and recommendation, there is no basis for a hearsay objection given that the hearsay rule did not apply at the evidentiary hearing. At the heart of those two objections is the issue the defendant asserts in the next few objections, albeit in different ways: that Judge Duffin was wrong in concluding that the correctional officers' search and the subsequent Act 79 law enforcement search were based on information sufficiently reliable to give rise to the required reasonable suspicion.

2. *Reasonable Grounds/Reasonable Suspicion*

The third specific objection the defendant makes is that Judge Duffin erred in "finding that 'the neighbor's tip supported reasonable suspicion that evidence of a violation of [the defendant's] rules of supervision would be found in his home.'" Dkt. No. 52 at 24. The fourth specific objection is almost identical: that Judge Duffin erred in finding "that the uncorroborated tip amounted to reasonable suspicion that evidence of a rule violation would be found in [the defendant's] home." Id. at 26. The sixth specific objection the defendant makes is that Judge Duffin erred in considering "that Milwaukee Police Officers neglected to determine if reasonable suspicion was present before there was even an entry into" the defendant's home, asserting that the officers should have asked the corrections agents to state their grounds for conducting the search. Id. at 31. The seventh specific objection is that Judge

50

Duffin erred "because there is no corroborative information about the tip here." Id. at 32. All these objections relate to whether the corrections officers or the law enforcement officers had reasonable suspicion to search.

<blockquote>
a. "Reasonable suspicion" for the correctional officers' search under the Wisconsin Administrative Code
</blockquote>

Under Wis. Admin. Code §DOC 328.22(2)(a), "[a] search or seizure is appropriate and consistent with the goals and objectives of supervision . . . [w]hen an employee has reasonable grounds to believe the offender possesses contraband or evidence of a rule violation on or within his or her person or property." In deciding whether there are "reasonable grounds," the employee may consider any of the following:

(a) The observations of employees.
(b) Information provided by informants. In evaluating the reliability of the information and the informant, the employee shall consider the following:
1. The detail, consistency and corroboration of the information provided by the informant.
2. Whether the informant has provided reliable information in the past and whether the informant has reason to provide inaccurate information.
(c) The activity of the offender.
(d) Information provided by the offender.
(e) The experience of the employee with that offender or in a similar circumstance.
(f) Prior seizures of contraband from the offender.

Wis. Admin. Code §DOC 328.22(3)(a)-(f).

"'Reasonable grounds' has been interpreted to be less demanding than the probable cause standard." State v. Thomas, 383 Wis. 2d 785, *5 (Wis. 2018) (citing State v. Purtell, 358 Wis. 2d 212, 230 (Wis. 2014)). The lesser standard is justified because "probation officers must be permitted 'to respond

51

quickly to evidence of misconduct' and 'the deterrent effect that the possibility of expeditious searches' creates would be unduly compromised by a probable cause requirement." <u>Purtell</u>, 358 Wis. 2d at 230 (quoting <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 876 (1987)).

There is no evidence in the record that Agent Wood (or Rozier) made any personal observations of the defendant, so the factor in §DOC 328.22(3)(a) does not weigh in favor of "reasonable grounds" for a search.

Rozier testified, however, that there *was* information provided by a type of informant—the neighbor. As for the "detail, consistency and corroboration of the information" the neighbor provided, Rozier testified that she made the decision to forward the Community Corrections Home Search Plan for final approval based on several details: the neighbor knew the defendant was on GPS monitoring, the neighbor indicated that she saw the magazine in the defendant's pocket, the neighbor described speaking with the defendant about the break-ins in the neighborhood and the neighbor described the defendant's response that that was why he kept protection on him. Dkt. No. 47 at 24, lines 3-8; 25, lines, 9-16. Rozier also considered the timing of the information—the neighbor provided it at a time when field agents were rarely conducting home visits because of the pandemic. <u>Id.</u> at 28, lines 8-25; 29, lines 1-5. The neighbor provided details—the magazine was in the defendant's right pocket; it was an extended magazine; the defendant mentioned it because the two were talking about break-ins occurring in the neighborhood. The information the neighbor provided was detailed.

52

Rozier also was able to corroborate some of that information. She knew that the defendant was on supervision following a serious offense. She could corroborate that the defendant was on GPS monitoring—something the neighbor likely would not have known unless the defendant had told her or unless she'd observed a monitoring bracelet.

There is no evidence that the neighbor had provided reliable information in the past; this is not surprising, because she was a neighbor, not a law enforcement informant (despite the defendant's insistence on labeling her as one). As to whether the "informant" had reason to provide inaccurate information, however, there is evidence in the record. Rozier testified that the department maintains confidential records relation to an individual's supervision and, from these records, she learned that the person who provided the tip identified themselves as a neighbor and provided a name and phone number. Dkt. No. 47 at 22, lines 13-22; 23, lines 3-5, 10-14. That means that the information was not provided by an "anonymous" tipster. The Supreme Court has held that anonymous tips, on their own, often don't provide any indication of the tipster's basis of knowledge or veracity. Florida v. J.L., 529 U.S. at 270 (citing Alabama v. White, 496 U.S. 325, 329 (1990)). But a *known* person who provides information "can be held responsible if her allegations turn out to be fabricated . . . ." Id. An informant who provides some self-identifying information is likely more reliable than an anonymous informant because "[r]isking one's identification intimates that, more likely than not, the informant is a genuinely concerned citizen as opposed to a fallacious

53

prankster." State v. Williams, 241 Wis. 2d 631, 649 (Wis. 2001). Here, Rozier knew that the person had reported that she was a neighbor, had provided her name and had provided a way to contact her. Rozier said that had she needed additional information, she had the ability to reach out to the neighbor because she had her contact information. Dkt. No. 47 at 26, lines 9-17.

The defendant asserts that Judge Duffin erred in finding that the neighbor was the one who mentioned the GPS monitoring, asserted that it is "just as likely that this information was supplemented by Agent Wood." Dkt. No. 52 at 25. But that is not how the language in the Community Corrections Home Search Plan is worded. The plan recounted that "WITNESS STATED THAT EVER SINCE CLIENT WAS PLACED ON GPS MONITORING THROUGH HOC, THERE HAS BEEN A LOT OF ACTIVITY TAKING PLACE AT HIS RESIDENCE WHICH APPEARS TO BE DRUG RELATED." Dkt. No. 29-1 at 1. The defendant's theory that it was Wood who related the activity at the defendant's home to the time he'd been placed on GPS monitoring is speculation.

The defendant also argues that the reference to GPS monitoring rendered the neighbor's information incredible because if the defendant had been on GPS monitoring and had been going in and out of his house, he would have been setting off the GPS monitoring alert frequently. Dkt. No. 52 at 30. But Rozier explained that the defendant had been placed on GPS monitoring on August 13, 2020 through the *House of Correction* for fleeing/eluding. Dkt. No. 47 at 29, lines 16-25; 31, lines 1-8. The GPS monitoring was in place for a

54

different case; Rozier's department did not monitor it. Id. at 47, lines 8-16. The defendant's argument assumes—with no evidence to support it—that (a) the GPS monitoring alerts had not been triggered through the House of Correction and that (b) the monitoring field was so narrow that the defendant would have triggered it by going into and out of his house.

The timing of the information also corroborated the information the neighbor had provided. At the time the neighbor called, the defendant had been on GPS monitoring for only nineteen days, so the neighbor's conversation with the defendant had to have been fairly recent.

There is no evidence that the factors in §DOC 328.22(3)(c)-(f) were present. But §328.22(a)(2) provides that a corrections employee has reasonable grounds for a search if *any* of the factors in §328.22(a)(3) are present. The record evidence shows that Wood—and Rozier—had detailed, partially corroborated information from a known individual and that they had no reason to believe that the person who provided that information—a neighbor who had given Wood her contact information—would provide inaccurate information. There was a reasonable ground for the corrections officers to believe that the defendant possessed contraband—a magazine—and that evidence that he had violated the conditions of his supervision (that he not possess guns or ammunition) would be found at his home.

          b.     "Reasonable suspicion" for the law enforcement officers' search under Act 79

Wis. Stat. §302.113(7r)—the portion of Act 79 that governs searches of persons on felony supervision—states:

A person released under [§302.113, Release to extended supervision for felony offenders not serving life sentences], his or her residence, and any property under his or her control may be searched by a law enforcement officer at any time during his or her period of supervision if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of release to extended supervision.

The Seventh Circuit has noted that "the Supreme Court has held that a law-enforcement officer may search a person on parole without *any* suspicion of criminal activity," and that because "[i]n Wisconsin extended supervision is essentially judge-imposed parole[,] [i]t follows that a search under section 302.113(7r), which requires reasonable suspicion of criminal activity or a violation of supervision, is constitutionally permissible." United States v. Caya, 956 F.3d 498, 500 (7th Cir. 2020) (citing Samson v. California, 547 U.S. 843, 847 (2006)). In considering whether law enforcement officers had reasonable suspicion to search a defendant on supervised release, courts first consider whether law enforcement had knowledge of the defendant's supervision status and then consider "whether, under the totality of the circumstances, the police officers had reasonable suspicion that [the defendant] was committing, was about to commit, or had committed a crime." State v. Euell, No. 2019AP277-CR, 2020 WL 1264070, *2 (Wis. Ct. App. Mar. 17, 2020) (citing State v. Anderson, 389 Wis. 2d 106, 117 (Wis. 2019)). Finally, the court must consider whether an Act 79 search was conducted in a "reasonable manner," ensuring that it was not "arbitrary, capricious, or harassing." United States v. Johnson, No. 20-cr-214, 2022 WL 102277, at *7 (E.D. Wis. Jan. 11, 2022).

56

The law enforcement officers knew of the defendant's supervision status. Corrections Officer Luebke testified that he and the other corrections agents decided to reach out to law enforcement and turn the search over to them. Dkt. No. 47 at 62, lines 2-4. Luebke was still in the residence when law enforcement officers arrived. Id. at 65, lines 18-25; 66, lines 6-9. Sgt. Schwarzhuber of the Milwaukee Police Department testified that he arrived on the scene after the corrections officers had initiated their search and that when he arrived, he was made aware that they'd found contraband. Id. at 72, lines 20-25; 73, line 1.

Under the totality of the circumstances, law enforcement also had more than a reasonable suspicion that the defendant had committed or was committing a crime. Corrections Officer Luebke testified that during the corrections search, he observed the loose ammunition on the dresser and the contents of the safe in the defendant's bedroom. MPD Sgt. Schwarzhuber, who had conducted roughly fifty to 100 Act 79 searches, testified that corrections officers had located the ammunition, safe and gun before he even arrived on the scene. Prior to his search, Schwarzhuber saw the contraband that had been located by the probation agents. Law enforcement had more than a mere hunch—more than reasonable suspicion—to believe that the defendant had committed a crime and violated his rules of supervision.

The defendant insists that for the law enforcement officers to have reasonable suspicion to search, they needed to ascertain that the correctional officers had reasonable grounds to conduct the search. He argues that the law enforcement officers should have asked the corrections officers where they got

the information that prompted them to search, and maintains that "[i]f that question had been answered honestly, any reasonable officer would have halted the search." Dkt. No. 52 at 31.

The suppression motion itself provides no authority supporting this theory that in the case of an Act 79 search, law enforcement officers must look beyond the contraband that they see when they arrive at the scene and delve into the grounds for the corrections officers' search. Dkt. No. 29. The defendant's reply brief in support of the motion provides no such authority. Dkt. No. 40. The defendant's post-hearing brief makes this argument for the first time, but does not provide any authority. Dkt. No. 48 at 8-9. And the defendant's objection provides no authority for the argument. Dkt. No. 52 at 31.

Wis. Stat. §302.113(7r) says that a law enforcement officer may search if the officer reasonably suspects that the person on supervision has committed or is committing a crime or a violation of a supervision condition. The officers in this case had more than reasonable suspicion, because they saw the contraband the corrections officers had seen during their search.

      c.    "Reasonable suspicion" for the law enforcement officers' search under the Fourth Amendment

For the reasons that the court already has discussed in analyzing the corrections officers' reasonable grounds for conduct the corrections search, the corrections officers and the law enforcement officers had reasonable suspicion to search under the Fourth Amendment. The defendant cites various cases he argues Judge Duffin ignored in concluding that the neighbor's information was

sufficient to justify the search (he does not say which search). Dkt. No. 52 at 26-27. He cites <u>Florida v. J.L.</u>, 529 U.S. 266, but that case involved an *anonymous* tip. The information in this case came from a *known* individual. He cites <u>Adams v. Williams</u>, 407 U.S. 143 (1972), but that is a case in which the Supreme Court concluded that a tip from a known person was sufficient to justify a stop. He cites <u>United States v. Lopez</u>, 907 F.3d 472, 481 (7th Cir. 2018) in which officers who knew only the informant's identity seized the defendant and deprived him of his liberty. That did not happen here; the defendant was not deprived of his liberty until after officers had found a significant amount of contraband. He cites <u>United States v. Watson</u>, 900 F.3d 892 (7th Cir. 2018)—again, a case involving an *anonymous* tip.

The defendant asserts that in <u>Navarette</u>, 572 U.S. 393, the Supreme Court

> has identified three factors that make an anonymous tip reliable enough to create reasonable suspicion: the tipster (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing.

Dkt. No. 52 at 27. Aside from the fact that—again—the information in this case was not provided by an *anonymous* tipster, the defendant misstates the Supreme Court's holding in <u>Navarette</u>. In <u>Navarette</u>, officers stopped a pickup truck because it matched the description given by a 911 caller who said the truck had run her off the road. <u>Navarette</u>, 572 U.S. at 395. The Court did not hold, as a general rule, that any anonymous tip must satisfy the three factors the defendant recounts; it held that the particular 911 call in <u>Navrette</u> bore

sufficient indicia of reliability because the caller claimed eyewitness knowledge of the dangerous driving, the timeline of events suggested that the caller reported the driving soon after she was run off the road and she used a system—the 911 system—that records calls and allows callers to be identified. Id. at 399-401.

Navrette *supports* this court's conclusion that the neighbor's information was sufficient to provide reasonable suspicion. The neighbor reported seeing the magazine sticking out of the defendant's pocket and hearing him say that he carried protection—eyewitness knowledge. The neighbor tied the information to the date the defendant was placed on GPS monitoring, indicating that the neighbor had made the call some in the nineteen days after he was placed on monitoring. And the neighbor provided her name and contact information.

The corrections officers—and certainly, by the time they arrived, the law enforcement officers—had reasonable suspicion sufficient to justify the search.

### 3. *United States v. Slater*

The fifth specific objection the defendant makes to Judge Duffin's report and recommendation is that Judge Duffin erred in failing "to discuss the decision . . . in *United States v. Slater*, Eastern District of Wisconsin, Case Number 21-CR-106 (February 24, 2022)." Dkt. No. 52 at 34. The defendant interprets the Slater decision (which he cited in every pleading he filed related to the suppression motion) as requiring that before conducting an Act 79 search, law enforcement officers must conduct extensive, pre-search investigation—or, at least, that it is a "best practice" for law enforcement

60

officers to do so. That is *not* what the <u>Slater</u> decision held, or even what it implied.

In <u>Slater</u>, law enforcement received a tip from a concerned citizen who reported that "lots of cars visited the [defendant's] residence throughout the day and that people from those cars would go into the residence, then leave a short time later." <u>Slater</u>, 2022 WL 558097 at *2. Based on that call, the police began investigating possible drug activity at the residence. <u>Id.</u> As the defendant points out, that investigation included searches of the defendant's social media, surveillance, garbage pulls and vehicle tracking. <u>Id.</u> at **2-3. But while the investigation revealed suspicious activity, it revealed no drugs, no controlled purchases, no contraband that the officers could connect to the defendant. <u>Id.</u> But there was more. Slater's probation officer issued an apprehension request for him—similar to an arrest warrant—because the probation officer was aware, not only of the fact that officers had been investigating Slater for suspected drug activity, but the fact that at around 2:00 a.m. on August 25, 2020, Illinois police attempted to stop a car that was speeding toward Wisconsin at over 100 miles an hour; Wisconsin state troopers also tried to stop the car, were able to get the license plate and traced it to the defendant's mother's house. <u>Id.</u> at *3. The defendant was not there and the defendant's mother told officers that the defendant had taken the car hours earlier. <u>Id.</u> In addition, the probation officer knew that in the wee hours of the morning on July 28, 2020, the defendant had been cited in Illinois for another

61

incident of speeding and driving with a suspended license. Id. The trips to, and the citation in, Illinois violated Slater's travel restrictions on supervision. Id.

Officers executed the apprehension request, then searched the residence and found contraband, including guns, drugs, drug paraphernalia and cash. Id. at **4–6. After being federally charged, Slater filed a motion to suppress that "targeted the entire chain of events, from [the probation officer's] issuance of the apprehension request to the search of the bedrooms." Id. at *19. The magistrate judge recommended that this court deny the motion to suppress; the defendant objected to all his findings. Id. This court adopted the magistrate judge's report and recommendation and denied the motion to suppress. Id. at *30.

It is puzzling that the defendant perceives that the Slater decision supports his arguments. In Slater, law enforcement officers went to the defendant's probation officer and told her about the drug investigation and the August fleeing incident; this information, coupled with the probation officer's knowledge of the July traffic citation, prompted her to issue the apprehension request. Id. at *3. This sequence of events caused Slater to accuse law enforcement of "subvert[ing] the Fourth Amendment by procuring a probation warrant through subterfuge." Id. at *20 (quoting from the defendant's brief). In other words, Slater argued that law enforcement unlawfully used the probation officer to obtain an apprehension request because they did not have probable cause to obtain a warrant. This is the very "stalking horse" argument that the defendant maintains he is *not* making in this case. Dkt. No. 40 at 6.

62

The facts in this case are the opposite of those in <u>Slater</u>; here, the *probation* officer received information that gave her reasonable grounds to suspect that the defendant was violating his supervision and law enforcement arrived only after probation had found contraband. In <u>Slater</u>, this court concluded that, *despite* the fact law enforcement had been—unsuccessfully— conducting an investigation into possible drug trafficking prior to going to the probation officer with information about the speeding violations in Illinois, those trips, and some of what officers had seen during their surveillance, gave the probation officer a basis for issuing the apprehension request. <u>Id.</u>

Nowhere in <u>Slater</u> did this court state, or imply, that officers conducting an Act 79 search must first leave no other stone unturned. That would not be a correct statement of Act 79's requirements or of the law. The defendant's reliance on <u>Slater</u> is misplaced (and his argument that Judge Duffin should have discussed the decision has no merit).

4.    *Scope and Duration of the Search*

The eighth and final specific objection the defendant makes to Judge Duffin's report and recommendation is that Judge Duffin concluded that the scope and duration of the search were reasonable. Dkt. No. 52 at 32. The defendant repeats an unfounded assertion he made in earlier pleadings—that "[g]iven the sheer scope and number of rooms searched and contraband recovered, the police were searching [the defendant's] home unreasonably for hours and hours." <u>Id.</u> at 33.

63

As the court discussed in the analysis of the reasonable suspicion for the Act 79 search, courts must consider whether such a search was conducted in a "reasonable manner," ensuring that it was not "arbitrary, capricious, or harassing." United States v. Johnson, No. 20-cr-214, 2022 WL 102277, at *7 (E.D. Wis. Jan. 11, 2022). This is a fundamental Fourth Amendment principle, as well—the Fourth Amendment prohibits only "unreasonable" searches and seizures. Courts consider the totality of the circumstances in determining whether a search is reasonable, and assess "on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Samson, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. 112, 118–119 (2001)).

There is no evidence in the record that the search—either by the corrections officers or by law enforcement—was harassing. The defendant was taken into custody under an apprehension warrant; it appears that the search happened after he was arrested and that other people in the residence were undisturbed by it. There is no evidence in the record that the search was arbitrary. The court has discussed *ad nauseum* the reason the corrections officers conducted their search—a report from a neighbor that the defendant had an extended magazine—and the reason for the law enforcement officers' search—because the corrections officers found contraband. For the same reason, the searches were not capricious.

The defendant relies on his perception of the length of the search. He maintains that one officer's body camera footage was over two and a half hours and insists that that footage showed only what was going on downstairs. He maintains that because officers searched several rooms, and turned up a significant amount of contraband, the search must have lasted longer than that. It must have lasted "hours and hours." But Schwarzhuber explained that the search was not, in his experience, that long. He explained that it had taken more time than it otherwise might have because the officers were trying to locate the firearm that the defendant's girlfriend said was in the house (she didn't know where it was) and because they found ammunition for a rifle that they could not locate. Schwarzhuber also explained that there was no body cam video of the search of the upstairs area because he participated in that search and was wearing plain clothes, which meant he was not required to wear a body camera.

The defendant's insistence that the search was unreasonable because, in his view, it must have taken "hours and hours," has no support in the record. There is no evidence that the search was not reasonable, or that it was harassing, arbitrary or capricious.

X.    **Conclusion**

The court **ADOPTS** Judge Duffin's report and recommendation. Dkt. No. 42.

The court **DENIES** the defendant's second motion to suppress. Dkt. No. 30.

The court **OVERRULES** the defendant's objections to Judge Duffin's second report and recommendation. Dkt. No. 52.

The court **ADOPTS** Judge Duffin's report and recommendation. Dkt. No. 51.

The court **DENIES** the defendant's first motion to suppress. Dkt. No. 39.

Dated in Milwaukee, Wisconsin this 2nd day of August, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**